**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FRANCIS H. KEPHART, | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. 4:11-CV-00181 |
| | : | |
| vs. | : | (Complaint Filed 1/26/11) |
| | : | |
| MICHAEL ASTRUE, | : | |
| COMMISSIONER OF SOCIAL | : | (Judge Caputo) |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM**

**BACKGROUND**

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Francis H. Kephart's claim for social security disability insurance benefits.

On October 1, 2007, Kephart filed protectively[1] an application for disability insurance benefits. Tr. 11, 88, 112-117, 125 and 127.[2] The application was initially denied by the Bureau of Disability Determination[3] on July 7, 2008. Tr. 92-102. On July 23, 2008, Kephart requested a hearing before an administrative law judge. Tr. 11 and 104. After about

---

[1] Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[2] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of his Answer on March 30, 2011.

[3] The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 93.

15 months had passed, a hearing was held on November 5, 2009. Tr. 29-69.  On January 28, 2010, the administrative law judge issued a decision denying Kephart's application. Tr. 11-23.  On March 17, 2010, Kephart filed a request for review with the Appeals Council and on December 14, 2010, the Appeals Council concluded that there was no basis upon which to grant Kephart's request. Tr. 1-5 and 108-111.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Kephart then filed a complaint in this court on January 26, 2011.  Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on August 8, 2011,  when Kephart elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Kephart met the insured status requirements of the Social Security Act through December 31, 2011. Tr. 11, 13 and 149.

Kephart was born in the United States on April 20, 1967. Tr. 112, 125 and 127. Although Kephart withdrew from high school during the 11th grade, he obtained a General Equivalency Diploma in 2000 and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 152, 160 and 674.  The record reveals that Kephart in 1984 completed vocational training in diesel mechanics and in 2001

---

[4]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

completed police officer training . Tr. 160.  He received his GED while serving in the military. Tr. 674.  The record further reveals that Kephart either served in the Army,  Army Reserve or National Guard during 1999, 2000, 2002 and 2003  Tr. 113 and 133-136 and 674.[5] Kephart stated that he had two honorable discharges and served in Germany after September 11, 2001. Tr. 674.

Records of the Social Security Administration reveal that Kephart had reported earnings in 1984 through 1987 and 1989 through 2007 as follows: in 1984 $110.38, 1985 $5503.92, 1986 $7892.13, 1987 $3663.73, 1989 $688.81, 1990 $3179.75, 1991 $1378.00, 1992 $7559.81, 1993 $9032.14, 1994 $1052.99, 1995 $31.39, 1996 $769.02, 1997 $11,616.50, 1998 $14,339.01, 1999 $9218.80, 2000 $12,289.06, 2001 $4887.70, 2002 $21,772.95, 2003 $23,967.54, 2004 $23,745.29, 2005 $29,479.90, 2006 $20,304.11, and 2007 $5970.06.  Tr. 146.  Kephart's total earnings during those years were $218,452.99. Id. Kephart  has no reported earnings after 2007. Id.

Kephart's past relevant employment[6] was as a forklift operator described by a vocational expert as semi-skilled, medium work; as a construction laborer which was described as unskilled, medium to heavy work; as a police officer for a township in Carbon County which was described as semi-skilled, medium work; and as a deputy sheriff for

---

[5] Records of the Social Security Administration reveal that Kephart received military pay in the amount of $4912.82 in 1999; $639.58 in 2000; $9544.22 in 2002; and $3386.11 in 2003. Tr. 133-134 and 136.

[6] Past relevant employment in the present case means work performed by Kephart during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

Carbon County which was described as semi-skilled, heavy work. [7] Tr. 61-62, 154 and 673-

---

[7]The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as  loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

> (d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

674.

Kephart claims that while employed by the Carbon County Sheriff's Department he became disabled on August 30, 2006,[8] as the result of a neck injury. Tr. 153 and 209.  The impetus for the injury was an incident where Kephart  in order to avoid being hit by an opening courthouse door quickly jumped backwards and as he did so he felt a "pop" in his neck and began having severe pain in his neck, left scapula and left arm.  Tr. 209.   An MRI of the cervical spine performed later that day revealed disc herniations. Tr. 210 and 372-373.   In October, 2006, Kephart successfully  underwent surgery to address the herniations. Tr. 215-216 and 21-224.

Kephart than developed paresthesia[9] in the hands, headaches, and pain in the right shoulder blade and thoracic regions of the back.  Tr. 311-315 and 330.  An MRI of the thoracic spine in April, 2007, revealed a small right paracentral disc protrusion at the T5-T6 level of the thoracic spine and a small leftward protrusion at the T7-T8 level. Tr. 285-286.  From May 14, 2007,  through June 7, 2007, Kephart had physical therapy. Tr. 233-235.  At the end of that course of physical therapy Kephart told Terence F. Duffy, M.D., a treating pain management specialist, that he was doing much better.  Tr. 333.

On July 7, 2007, Dr. Duffy assessed Kephart's physical capabilities and

---

[8]Kephart was 39 years of age on his alleged disability onset date and considered a "younger individual" under the Social Security regulations. 20 C.F.R. § 404.1563(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). Younger individuals can more readily adjust to other work. Id.

[9]Paresthesia is defined as "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimuli." Dorland's Illustrated Medical Dictionary, 1371 (30th Ed.  2003).

concluded that Kephart had the ability to sit, stand, or walk for up to eight hours per day; lift/carry 11-25 pounds occasionally; lift up to 10 pounds without restriction; use his hands for grasping, fine manipulation, and pushing/pulling; use his feet/legs for foot controls occasionally; and perform postural activities occasionally. Tr. 357-358.

In July, 2007, Kephart returned to work for Carbon County as a maintenance worker in the county-run nursing home, a light duty position. Tr. 310 and 334. However, Kephart ceased working on September 10, 2007. Tr. 153. Kephart claims that he is totally disabled because of extreme neck and back pain, headaches and depression. Id.

For the reasons set forth below we will affirm the decision of the Commissioner denying Kephart disability insurance benefits.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a

reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970

(3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance claims.  <u>See</u> 20 C.F.R. §404.1520; <u>Poulos</u>, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[10] (2) has an impairment that is severe or a combination of impairments that

---

[10]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

is severe,[11] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[12] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must

---

[11] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

[12] If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

[13] If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

include a discussion of the individual's abilities.  Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Kephart had not engaged in substantial gainful work activity since August 30, 2006, the alleged disability onset date. Tr. 13.   Specifically, the administrative law judge stated as follows: "The claimant's earnings records and work-history report . . . reflect that he worked after the alleged disability onset date; however, this work was an unsuccessful work attempt.  The work was for a brief period of approximately two months in 2007 and the claimant testified credibly that he was not able to continue performing the work after that time." Id.

At step two of the sequential evaluation process, the administrative law judge found that Kephart  had the following severe impairments: degenerative disc disease of the cervical spine with herniated discs at C5-6 and C6-7, status post cervical fusion; degenerative disc disease of the thoracic spine; headaches; bilateral knee pain, status post surgical intervention; depression; and anxiety." Id.

At step three of the sequential evaluation process the administrative law judge found that Kephart's impairments did not individually or in combination meet or equal a listed impairment. Tr. 13-16.

At step four of the sequential evaluation process the administrative law judge found that Kephart could not perform his prior relevant medium to heavy work but that he had the residual functional capacity to perform a limited range of unskilled, sedentary work.

10

Tr. 16-22.   Specifically, the administrative law judge found that Kephart could perform unskilled, sedentary work which involved

> the ability to lift 10 pounds occasionally and five pounds frequently.  The claimant can sit for an unrestricted amount of time in an eight hour day, and he can perform jobs that involve a primarily seated position with minimal standing and walking activities required. He can perform work that allows the use of a handheld assistive device when standing and walking for maintaining balance and to reduce his weight-bearing. He can balance occasionally with such a device. The claimant can perform occasional operation of foot controls. The claimant can perform a job that involves ascending of ladders, scaffolds or ropes on an emergent basis. The claimant can climb or descend ramps or stairs on an occasional basis, at best. The claimant can perform postural activities such as stooping, crouching, kneeling or crawling at the maximum capacity of occasional, at best.  The claimant can perform work that involves no more than occasional rotation, flexion and extension of the neck, and which does not require the claimant's neck to be fixed in a static position for extended periods of time, such as looking into a microscope.  The claimant can perform frequent lateral reaching and occasional overhead reaching. The claimant can engage in frequent handling and grasping on a gross motor level and frequent fine motor dexterous coordination.  The claimant should avoid walking over uneven terrain for extended distances to the extent possible. The claimant can perform work that involves communication modalities that are primarily oral in nature, with some simple written communication being acceptable.  The claimant can work with objects or tasks that do not involve team-type work orientation or direct work-related, in-person contact with members of the public, but he can have incidental contact with co-workers.  The claimant can perform work that is of a simple, unskilled nature in a work-setting that is not subject to frequent changes.

Tr. 16.  In concluding that Kephart had the residual functional capacity to engage in this extremely  limited range of unskilled, sedentary work, the administrative law judge relied, *inter alia*, on the opinion of Dr. Duffy, Kephart's treating pain management specialist; the opinion of Mary Ryczak, M.D., a state agency medical consultant, who reviewed Kephart's medical records; the opinion of Jonathan Gransee, Psy.D., a state agency psychologist, who examined Kephart and prepared a report of the examination and a medical source statement of Kephart's mental ability to do work-related activities; and the opinion of Anthony Galdieri,

Ph.D., a state agency psychologist who reviewed Kephart's medical records.   The administrative law judge rejected the opinion of John P. Degenhart, D.C., a treating chiropractor, and the opinion of Frank Vita, Ph.D., a treating psychologist.

At step five, the administrative law judge based on a residual functional capacity of a limited range of sedentary work as described above and the testimony of a vocational expert found that Kephart had the ability to perform unskilled, sedentary work as a bench-type assembler, packager, and inspector, and that there were a significant number of such jobs in the national, state and local economies. Tr. 23.

The administrative record in this case is 724 pages in length and we have thoroughly reviewed that record.   The administrative law judge did an adequate job of reviewing Kephart's vocational history and medical records in his decision. Tr. 11-23. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 13, Brief of Defendant.

Kephart argues that the administrative law judge erred (1) when he rejected the opinion of Dr. Vita, Kephart's treating psychologist; (2) when he failed to adequately assess Kephart's subjective complaints; (3) when he relied on sporadic daily activities to reject Kephart's subjective complaints; and (4) when he found that Kephart had the residual functional capacity to perform sedentary work.  We find no merit in Kephart's arguments.

On February 1, 2009, Dr. Vita authored a report in which he stated that he initially had contact with Kephart on March 4, 2008. Tr. 508.  At that time Kephart appeared depressed and anxious with respect to "his ongoing difficulty with pain management as well as his inability to function as he had prior to his injuries." Id.   Dr. Vita stated that Kephart suffered from Major Depressive Disorder and Generalized Anxiety Disorder.  Id.  Dr. Vita

stated that he recommended weekly therapy sessions and that Kephart had attended those sessions consistently and had made excellent progress. Id. Dr. Vita's letter was not accompanied by any treatment records.

In October, 2009, Dr. Vita completed a "Mental Functional Capacity Questionnaire" that  required Dr. Vita to place a check mark as to whether Kephart had no limitations, mild limitations, moderate limitations, marked limitations,  or extreme limitations with respect to 20 areas of mental functioning. Tr. 511-513.  Dr. Vita found that Kephart had no limitations in 3 areas (the ability to carry out very short and simple instructions; the ability to make simple work-related decisions; and the ability to be aware of normal hazards and take appropriate precautions), moderate limitations in 4 areas (the ability to remember locations and work-like procedures; the ability to understand and remember very short and simple instructions; the ability to carry out detailed instructions; and the ability to ask simple questions or request assistance), marked limitations in 2 areas (the ability to understand and remember detailed instructions; and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness), and extreme limitations in 11 areas (the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;  the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from

supervisors; the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes in the work setting; the ability to travel In unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others). Id. This questionnaire was not accompanied by a detailed report or Kephart's treatment records.

On August 16, 2007, Kephart commenced receiving chiropractic treatments from Dr. Degenhart.[14]   Tr. 423, 4227, 429 and 442.    The record reveals that Kephart received  the treatments until July 16, 2008. Tr. 381-386, 426, 428-439, 446, 449 and 451-453.  The treatments consisted of chiropractic adjustments,  stretching, traction, electrical stimulation, and massage therapy. Id.  On February 19, 2008, Dr. Degenhart completed a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities." Tr. 456-457.   Dr. Degenhart stated that Kephart could only occasionally lift/carry 2 to 3 pounds; Kephart could only stand 1 hour or less and sit 2 hours in an 8-hour workday; and Kephart had several postural and manipulative limitations. Id.  No explanatory report accompanied Dr. Degenhart's assessment and the chiropractic treatment notes do not reveal the basis for Dr. Degenhart's extreme limitations.   The assessment appears to be primarily based on Kephart's subjective complaints and Kephart's history of spinal surgery. There is a notation that the circumference of Kephart's left arm was 4 inches smaller than than Kephart's right arm. Tr. 456.  However, we do not discern this finding  in the chiropractic

---

[14]A chiropractor is not an "acceptable medical source" under the Social Security regulations "to establish whether [a claimant] has a medically determinable impairment." 20 C.F.R. § 404.1513(a).  A chiropractor may be considered an "other source[] to show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513(d).

treatment records or the records of any other treating physician.[15]  Furthermore, we do not

_____

[15]On May 10, 2007, Kephart had an appointment with  Dr. Duffy at which, Kephart reported that he did not have any upper extremity weakness but intermittent paresthesia in his hands. Tr. 330.  Motor testing of the upper and lower extremities on that date was normal. Tr. 332.  On June 7, 2007, Kephart reported to Dr. Duffy that his headaches had resolved, his upper cervical pain had significantly improved, and he had no upper extremity radicular pain, weakness or parethesia. Tr. 333.  On July 2, 2007, Kephart again denied any upper extremity weakness or paresthesia. Tr. 334. A physical examination on that date revealed that "[r]ange of motion throughout the upper extremities is full with motor strength symmetrical at 5/5." Id.  An MRI of Kephart's thoracic spine on October 3, 2007, did reveal what was described as a developmental (congenital) defect of a partial fusion at the T3-T4 level of the thoracic spine. Tr. 302 and 340.  No disc herniations were noted but there was some mild narrowing of the neural foramen at T4-T5 on the right. Id. On October 4, 2007, Dr. Duffy found that Kephart's reflexes in the upper extremities were normal (2/4) and that motor testing and sensation were normal. Tr. 339.  On October 5, 2007, Kephart had a cardiac stress test, the report of which indicates that "[h]is 85% maximum predicted heart rate is 153 beats per minute," that Kephart "exercised for 9 minutes reaching a peak heart rate of 155 beats per minute" and that there were "no electrocardiographic changes . . . consistent with ischemia" and "[n]o arrhythmias." Tr. 304.   Nuclear imaging of the heart revealed a left ventricular ejection fraction of 65%, which is normal.  Tr. 303.  On November 26, 2007, Thomas W. Hanlon, M.D., a treating physician found that Kephart had "decrease[d] muscle tone in the left triceps, biceps" but that Kephart's motor strength was normal (5/5). Tr. 465.  Dr. Hanlon did note that "[s]ensation demonstrated a left-sided paresthesia in C6-7." Id.  John R. Cifelli, M.D., a treating physician who in October, 2006, performed the neck surgery, after examining Kephart on December 6, 2007, stated that Kephart's "left triceps and biceps strengths have returned to normal at 5/5." Tr. 310.  Dr. Cifelli further stated that "[a]s far as [Kephart's] neck and arm is concerned, he has had a good outcome and his other issues including a small left T7-T8 disk bulge are being treated with nerve blocks quite well." Id.   On December 11, 2007, Dr. Duffy's physical examination of Kephart revealed "no significant tenderness or spasm in the upper cervical or trapezius" regions, shoulder range of motion was full, and motor testing was normal and sensation was intact. Tr. 340.  Approximately two months later, on February 2, 2008, Dr. Degenhart, the chiropractor, oddly reported that Kephart had "no use of his left arm." Tr. 440.  Electrodiagnostic studies (a motor and sensory nerve study) of the upper extremities performed and interpreted by Dr. Duffy on June 30, 2008, revealed that Kephart had a moderate ulnar neuropathy at the left elbow,  a mild ulnar neuropathy at the right elbow, and chronic left C-7 radiculopathy. Tr. 360-362.  Dr. Duffy recommended conservative treatment for the ulnar neuropathy and advised Kephart "to avoid any compression of the ulnar nerve at the elbow such as resting his elbows on tables and armrests." Id.   Motor testing by Dr. Duffy during the physical examination of Kephart on June 30, 2008, revealed "slight weakness to the left hand instrinsics." Tr. 360.  On July 28, 2008, Dr. Hanlon observed that Kephart "was positive for a decrease in his left grip." Tr. 461. However

(continued...)

see how such a finding by itself would prevent Kephart from engaging in the limited range of sedentary work set by the administrative law judge.

As noted earlier, Dr. Duffy, a treating physician, in June, 2007, found that Kephart was capable of  sitting, standing and walking for up to 8 hours during an 8-hour workday; Kephart was able to lift/carry up to 25 pounds occasionally and up to 10 pounds without restriction; Kephart had the ability to use his hands for grasping, fine manipulation, and pushing and pulling; Kephart had the ability to use his legs for the operation of foot controls; and Kephart had the ability to perform postural activities, such as bending and crouching, on an occasional basis.  Tr. 357-358.   Dr. Duffy's opinion supports the ALJ's decision.

Also, with respect to Kephart's alleged mental limitations,  the medical notes of Mark Perlmutter, M.D., another treating physician, from June 2007 to February,2009, consistently reflect that Kephart was fully oriented, cooperative, relaxed, well-groomed, and not in any acute distress; Kephart did not demonstrate overt signs of depression, anxiety, or agitation; Kephart did not appear restless, looked healthy and had a normal affect. Tr.

---

[15](...continued)
sensation was grossly intact to light touch and reflexes were "surprisingly symmetric." Id. On March 4, 2009, Kephart had an appointment with Dr. Hanlon. Tr. 555. At that appointment Kephart stated that he had "much less" thoracic pain but "still occasionally has some radicular pains around to the left chest wall but they are much less since his last epidural steroid injection." Id.   A physical examination of Kephart by Dr. Hanlon revealed that Kephart's motor strength was normal (5/5) "with the exception of the left grip strength which [was] diminished unchanged from previous." Id.   Physical therapy records dated March 25, May 19 and June 23, 2009, reveal that Kephart had no significant problem with ambulation (walking). Tr. 647 and 651-652.

With respect to Kephart's bilateral ulnar neuropathy at the elbows, Kephart has not argued that the requirement that he avoid resting his elbows on tables and armrests would prevent him from working as a bench-type assembler, packager or inspector.

238, 242, 483, 492, 565, 571, 576, 585, 589, 592, and 596.

On June 16, 2008, Dr. Gransee, the state agency psychologist who examined Kephart, found that Kephart had no limitations with respect to understanding and remembering short, simple instructions, carrying out short, simple instructions, making judgments on simple work-related decisions and only mild (slight) limitations with respect to understanding and remembering detailed instructions and carrying out detailed instructions. Tr. 390.   Dr. Gransee further found that Kephart's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting was not affected by his mental impairments. Id.  Also, Dr. Galdieri, the state agency psychologist, who reviewed Kephart's medical records, concluded that Kephart was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment." Tr. 420.  Finally, with respect to Kephart's physical abilities Dr. Ryczak, the state agency physician, on June 18, 2008, concluded after reviewing the medical records, that Kephart had the physical residual functional capacity to perform the full range of light work. Tr. 398-404.

The social security regulations specify that the opinion of a treating physician may be accorded controlling weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p.  An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements.  20 C.F.R. § 404.1508 (2007).  Dr. Vita's opinion of extreme disabling mental limitations, during the relevant time period, was not only unsupported by treatment records, but also inconsistent

17

with other evidence.  Likewise, the opinion of Dr. Degenhart, the chiropractor, is inconsistent with the other evidence, including the opinions of treating physicians.  The administrative law judge appropriately accepted the opinions of two state agency psychologists who addressed Kephart's mental limitations and the opinion of a state agency physician who addressed Kephart's physical limitations.

The administrative law judge's residual functional capacity assessment is clearly supported by the medical records and the opinions of Dr. Duffy, Dr. Gransee, Dr. Galdieri, and Dr. Ryczak.  The administrative law judge's reliance on those three opinions was appropriate. See Chandler v. Commissioner of Soc. Sec., _F.3d._, 2011 WL 6062067 at *4 (3d Cir. Dec. 7. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

The administrative law judge appropriately took into account Kephart's physical and mental limitations in the residual functional capacity assessment.  The administrative law judge limited Kephart to a limited range of unskilled, sedentary work.  The vocational expert identified jobs that met those requirements and the administrative law judge appropriately accepted the vocational expert's testimony.

The administrative law judge stated that Kephart's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of unskilled sedentary work.  Tr. 17.  The administrative law judge was not required to accept Kephart's subjective claims regarding his physical and mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding

the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ."  Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility.").  Because the administrative law judge observed Kephart when he testified at the hearing on November 5, 2009, the administrative law judge is the one best suited to assess the credibility of Kephart.

After the administrative law judge issued his decision, Kephart's attorney submitted further evidence to the Appeals Council.   Evidence submitted after the administrative law judge's decision cannot be used to argue that the administrative law judge's decision is not supported by substantial evidence.  Matthews v. Apfel, 239 F.3d 589, 594-595 (3d Cir. 2001).  The only purpose for which such evidence can be considered is to determine whether it provides a basis for remand under sentence 6 of section 405(g), 42 U.S.C.  Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984).  Under sentence 6 of section 405(g) the evidence must be "new" and "material" and a claimant must show "good cause" for not having incorporated the evidence into the administrative record. Id.

The evidence submitted by Kephart to the Appeals Council was a psychiatric report prepared on February 9, 2010, by Richard Fischbein, M.D., a non-treating psychiatrist, and what appear to be the records of Dr. Vita's treatment of Kephart. Tr. 662-678 and 683-

19

724.  The Commissioner has argued that we cannot consider this evidence because it  is not "new" and "material" and Kephart has not established "good cause" for failing to submit the evidence in a timely fashion.  Kephart did not respond to that argument in a reply brief. We are not convinced that the evidence is "new," "material" or that there is "good cause" for not having presented it to the ALJ.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


s/A. Richard Caputo
A. RICHARD CAPUTO
United States District Judge


Dated: April 13, 2012